IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:14-CR-432-WKW |
| | ) | |
| BOBBY RYDELL "YAK" NORMAN | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER
## ON REMAND FROM THE ELEVENTH CIRCUIT

On appeal, the Eleventh Circuit vacated the orders denying Defendant Bobby Rydell Norman's motions to withdraw his guilty plea and remanded this action for an evidentiary hearing. (Doc. # 590.) At the hearing held before the undersigned on July 23, 2019 (*see* Doc. # 622), Mr. Norman testified, among other things, that his plea was not entered knowingly and voluntarily, and therefore that it may be withdrawn. For the reasons discussed below, Mr. Norman's motions (Docs. # 311, 394) will be granted.

### I. FACTUAL BACKGROUND

The relevant factual background—supplemented by the evidentiary hearing held on July 23, 2019—is as follows.

On October 21, 2015, Mr. Norman filed a notice of his intent to plead guilty to three counts of the indictment charging him with conspiring to distribute controlled substances, distributing controlled substances, and maintaining a drug-

related premises. (Docs. # 267, 272, 274.) At the resulting change-of-plea hearing, which occurred on October 30, 2015, the Magistrate Judge proceeded with a partial plea colloquy. (Doc. # 320.) Mr. Norman acknowledged, among other things, that he had read and discussed the plea agreement with his attorney (*id.*, at 5); that no threats or coercion caused him to plead guilty (*id.*, at 6); that he pleaded guilty "of his own free will" (*id.*, at 9); and that he and his attorney had discussed the case, his charges, his right to proceed to trial, and the relevant Sentencing Guidelines (*id.*, at 10-11). (Here, the Magistrate Judge's inquiries closely track the requirements of Rule 11.)

But as the prosecutor began to read the factual basis for the guilty plea, "a problem arose." *United States v. Norman*, 736 F. App'x 223, 224 (11th Cir. 2018). Mr. Norman's responses raised concerns about whether he indeed understood the factual basis for his plea and the specific charges against him. (Doc. # 320, at 13-15.) The Magistrate Judge called for a pause in the proceedings. (*Id.* at 15.)

According to the hearing transcript, after this brief break, the Magistrate Judge moved forward and accepted the factual basis for Mr. Norman's plea. (*See id.*, at 17 ("THE COURT: . . . You agree, sir, that that's what happened? THE DEFENDANT: Yes, sir.").) Mr. Norman's reticence was gone. The plea was entered. And, likely because he was unaware of the content of the conversation during the break, "the

2

magistrate judge did not make any additional Rule 11 inquiries after the break." *Norman*, 736 F. App'x at 225.

Twenty-five days later, Mr. Norman filed a *pro se* motion to withdraw his guilty plea. (Doc. # 311.) He filed an additional motion, reiterating his interest in withdrawing his plea, in July 2016. (Doc. # 394.) In essence, Mr. Norman argued that "he accepted the plea agreement under duress imposed by his attorney," *Norman*, 736 F. App'x at 225, and amid threats from the Assistant United States Attorney ("AUSA") during the change-of-plea hearing. (*See, e.g.*, Doc. # 415 (noting that he was "left to []fend for myself against [the] AUSA" during the break in the change-of-plea hearing); Doc. # 311; *see also* Doc. # 394 (arguing that, during the change-of-plea hearing, Mr. Norman was "le[d] to believe that if I didn't [accept] the plea offered I would receive a life sentence").) The Magistrate Judge denied both motions without a hearing. (Docs. # 337, 406.) Mr. Norman asked for reconsideration (Docs. # 415, 436), but that motion also was denied (Doc. # 438). Thereafter, on September 23, 2016, Mr. Norman was sentenced to 151 months' imprisonment. (Doc. # 480.) He timely appealed.

Emphasizing the need for a more thorough factual record regarding the break in the middle of Mr. Norman's change-of-plea hearing, the Eleventh Circuit vacated the orders denying Mr. Norman's motions to withdraw his guilty pleas and ordered an evidentiary hearing to assess the voluntariness of his plea. *Norman*, 736 F. App'x

at 228 n.6 ("We are particularly concerned with what happened during the break in the plea-change hearing, because it took place after the Rule 11 inquiries. We therefore direct that the court conducting the evidentiary hearing on remand develop a record with respect to this break.").

On review, the unrecorded conversations during the pause—the center of Mr. Norman's motions to withdraw and the cause of his sudden turnaround—bothered the Eleventh Circuit. Its opinion suggested that the discussion between Mr. Norman, Mr. Fowler, and the AUSA may have rendered the plea involuntary (and, thus, invalid). *See id.* at 227. "[M]ost importantly, Norman's allegations that his attorney failed him during this break, after which no additional Rule 11 inquiries were made, potentially undermine the voluntariness of the entire second half of the hearing. This second half is when Norman acquiesced and entered his guilty plea." *Id.* It was thus one focus of the subsequent evidentiary hearing before the undersigned.

The pause in the proceedings was apparently motivated by Mr. Norman's expressed uncertainty regarding the factual underpinnings and elements of his plea. After numerous answers evincing Mr. Norman's disagreement ("I don't agree with that"; "I don't know who they were distributing it to"), the Magistrate Judge asked if Mr. Norman, the AUSA, and Mr. Fowler would "like a few minutes to talk." (Doc. # 320, at 15:6.)

4

But according to testimony from Mr. Norman at the July 23, 2019 hearing, during the pause, the AUSA focused primarily on the possible consequences of failing to plead guilty.[1] In particular, the AUSA directly threatened a lengthy sentence and the forfeiture of Mr. Norman's home: "Don't make me take your house and give you a lot of time." (Doc. # 622, at 60:20 (Fowler).) Her ultimatum was not lost on Mr. Norman. (*See, e.g.*, *id.*, at 127:14-18 (Norman) ("She just told me if I ain't plead guilty, she wasn't playing with me. She was going to do everything in her power to give me a life sentence."); *id.*, at 127:6-9 (Norman) ("She say she was going to take the house.").) Mr. Fowler later agreed that, as he understood it, these fears motivated Mr. Norman's plea:

> Q: And would you say that because of that fear [of losing his home], that caused him to want to go forward with this hearing?
>
> A (Fowler): Yes. Because if he got found guilty, that's a realistic option.

(*Id.*, at 64:9-12.) In subsequent testimony, Mr. Norman himself confirmed that fears of punishment, including a life sentence, motivated his decision to plead guilty. (*Id.*, at 130:17-21.)

Beyond the alleged threats, Mr. Norman has also expressed that, even after the pause, his understanding of the elements of his alleged crime remained murky.

---

[1] The AUSA is no longer employed at the United States Attorney's Office. She did not testify at the evidentiary hearing.

Despite repeated efforts from his attorney, Mr. Norman continued to insist that he did not understand the "conspiracy" theory underpinning his plea. (*See, e.g.*, *id.*, at 116:11.) He claimed to not "understand what was going on" (*id.*, at 116:6), including immediately following the break in his change-of-plea hearing. (*Id.*, at 128:5-16.)

In light of the facts described briefly above, and after a lengthy process, Mr. Norman persists in his request to withdraw his plea.

## II.  LEGAL STANDARD

Federal Rule of Criminal Procedure 11(d) states, in relevant part, that "[a] defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal." Here, the court accepted the plea, but Mr. Norman argues that he had a "fair and just reason" for requesting the withdrawal prior to his sentencing hearing.

"[A] defendant enjoys no absolute right to withdraw a guilty plea before sentencing." *United States v. McCarty*, 99 F.3d 383, 385 (11th Cir. 1996). Nonetheless, "pre-sentence motions to withdraw should be liberally construed," *id.*, and "[t]he decision to allow withdrawal is left to the sound discretion of the trial court," *United States v. Buckles*, 843 F.2d 469, 471 (11th Cir. 1988). "In determining whether the defendant has met this burden, the district court may consider the totality of the circumstances surrounding the plea." *Id.* at 471–72 (citing *United States v.*

*Gonzalez-Mercado*, 808 F.2d 796, 798-99 (11th Cir. 1987)). This examination is guided by several factors, including "(1) whether close assistance of counsel was available; (2) whether the plea was knowing and voluntary; (3) whether judicial resources would be conserved; and (4) whether the government would be prejudiced if the defendant were allowed to withdraw his plea." *Buckles*, 843 F.2d at 472 (internal citations omitted).

## III. DISCUSSION

These principles guide the following inquiry into whether Mr. Norman's plea was knowing and voluntary.

### A. <u>Close Assistance of Counsel</u>

Mr. Norman alleges that he did not receive close assistance of counsel. In considering whether a defendant received "close assistance," courts "examine whether counsel was available and utilized, as well as whether counsel performed adequately." *United States v. Wiggins*, 666 F. App'x 850, 855 (11th Cir. 2016).

During the plea colloquy, Mr. Norman appeared dissatisfied with the performance of his attorney. When asked if he was fully satisfied at the change-of-plea hearing, Mr. Norman answered: "Not really." (Doc. # 320, at 5:8.) Further, as discussed below, the transcript reveals both a lingering distrust and a persistent disconnect between Mr. Norman and his attorney with respect to the factual underpinnings of his plea and the elements of the crime. (*See, e.g.*, Doc. # 311 ("I

7

really feel I've been misle[d] by Mr. Fowler, and he kept threatening me with a sentence of twenty years to life in prison."); Doc. # 622, at 128:19 (Norman) (testifying that he did not understand the "conspiracy theory" underlying the guilty plea).)

Still, as relates to close assistance of counsel, the court ultimately finds that the assistance provided to Mr. Norman does not clearly violate the mandates of "close assistance," even if it did not satisfy Mr. Norman himself. Mr. Fowler credibly described repeated efforts to clarify the charges and other components of the plea agreement. Further, and perhaps more importantly, some of Mr. Norman's most substantial claims (*e.g.*, that Mr. Fowler switched the plea agreements without permission, and thus that Mr. Norman had been tricked by Mr. Fowler into signing a substantively distinct document) proved untrue. (*See, e.g.*, Doc. # 622, at 157:22-23 (Norman) ("[T]hey [are] the same plea. But at the time, I thought they was different.").) Nonetheless, convincing evidence demonstrates Mr. Norman's lingering confusion. And it suggests, at minimum, serious miscommunication. Although Mr. Norman's right to close assistance of counsel was not clearly violated, this factor does not weigh strongly against the withdrawal of Mr. Norman's plea.

B. <u>**Knowing and Voluntary Plea**</u>

In considering whether a guilty plea was made knowingly and voluntarily, "[b]efore accepting a guilty plea, the district court must ensure that the 'core

8

concerns' of Rule 11 are satisfied: (1) that the plea is not coerced; (2) that the defendant understands the charges against him; and (3) that the defendant understands the consequences of pleading guilty." *United States v. Harris*, 394 F. App'x 676, 678 (11th Cir. 2010) (citing *United States v. Lejarde-Rada,* 319 F.3d 1288, 1289 (11th Cir. 2003)). Considering these and other factors, there are serious concerns about whether Mr. Norman's plea was "knowing and voluntary." After consideration of the record and the new information presented at the evidentiary hearing, the court finds (1) that Mr. Norman misunderstood the charges against him and (2) that Mr. Norman entered his guilty plea in part due to threats that were very likely inappropriate but were not addressed in a satisfactory Rule 11 colloquy. The court, therefore, finds that the plea was not entered knowingly and voluntarily.

First, Mr. Norman does not appear to have understood the elements of the crime to which he pleaded—a fact that sheds serious doubt on the knowingness of his plea. Among other things, Mr. Norman now testifies that he did not understand the elements required to prove that he agreed to distribute cocaine. The following dialogue in the evidentiary hearing is illustrative:

> Q: Did you understand that the elements required the government to prove that you actually did have an agreement with one or more persons to distribute cocaine?
>
> A (Norman): No.
>
> Q: Did you understand . . . that's what the government needed to prove?

9

A (Norman): I learned that later on once I got in prison.

(Doc. # 622, at 116:25-117:7.) Similar dialogues, scattered throughout the hearing transcripts, call into question Mr. Norman's understanding of the elements of his alleged crime. For instance: "Q: [D]id you understand from [Mr. Fowler's statements] that the government didn't actually need to prove an agreement? A (Norman): Yes, ma'am." (*Id.*, at 104:1-4.) And again, in the same hearing:

> Q: After all the discussions you had with [Mr. Fowler], did you feel like you understood what the government needed to prove in order to prove the conspiracy?
>
> A (Norman): No, ma'am.
>
> Q: Okay. Did he leave you any impression as to what you . . . feel like he was saying to you that the government needed to prove?
>
> A (Norman): Basically, they didn't have to prove no connection or no agreement.

(*Id.* at 107:12-20.) Mr. Norman later explained that, despite not fully understanding or agreeing with the allegations raised by the AUSA, he responded yes as a "formality" (*id.* at 123:18) and because, during the break, she told him that he "better plead guilty. Like I say, she said I wouldn't never see my kids outside of prison." (*Id.* at 126:7-8; *see also id.* at 128:8 (Norman) (testifying that he agreed with the factual allegations because he "didn't want to spend the rest of [his] life in prison").)

Indeed, Mr. Norman's apparent confusion about the factual basis for his plea caused the Magistrate Judge to seek a pause in the proceedings. But, based on

10

testimony, the factual basis was addressed only briefly (and not, to Mr. Norman, satisfactorily) during the break, if at all. *See id.*, at 127:10-12 ("Q: Is it fair to say the conversation was just about the consequences you would face if you did not plead guilty? A (Norman): Yes, ma'am."). And if it *was* discussed, the misunderstanding was not remedied:

> Q: When you said yes, did you understand how the government would prove the case against you?
>
> A (Norman): No, ma'am.
>
> Q: Did you understand the government's conspiracy theory when you pled guilty?
>
> A (Norman): To this day, I don't understand it.

(*Id.*, at 128:17-19.)

Second, inappropriate threats and coercion seem to have motivated Mr. Norman, and the Rule 11 colloquy (which occurred *before* the threat) does not overcome this serious concern. As described above, during the break in the proceedings, the AUSA leveled substantial threats against Mr. Norman, focusing on the possible forfeiture of his house and the risk of a life sentence. (*See, e.g.*, Doc. # 622, at 127:6-18.) The house was among his major priorities (*see id.*, at 89:13-16), the proposed sentence was severe, and the threats were direct. (*See id.*, at 61:2 (Fowler) (testifying that, during the break, the AUSA directly said to Mr. Norman, "Don't make me take your house").)

11

The prosecutor's remarks regarding forfeiture of Mr. Norman's home, made off the record but directly to Mr. Norman, were improper, even if made in the presence of his attorney. The remarks can only be fairly construed as a threat by the Government, in that it was within the arguable realm of possibilities that it was true the Government could in fact take Mr. Norman's house, but would refrain from doing so if he gave up valuable rights. It thus put Mr. Norman in the untenable position of having to weigh his property rights against his liberty rights in the context of a short recess in a plea hearing.[2] He had already expressed sufficient doubt of the voluntariness of his plea of guilty prior to the recess—enough to derail the plea, as the Magistrate Judge realized. The threat of seizing his property—his house, no less—was sufficient to override Mr. Norman's reluctance to plead guilty, thus overwhelming his true desire to persist in a not guilty plea. In no meaningful way, under the totality of the circumstances (including threats of losing his home, not seeing his children, and a life sentence), can it be said that his resulting plea of guilty was voluntary.

---

[2] Though possible punishments are regularly leveraged in plea negotiations, the Supreme Court has noted the import of a "full opportunity to assess the advantages and disadvantages of a trial as compared with those attending a plea of guilty." *Brady v. United States*, 397 U.S. 742, 754 (1970). Even assuming a prosecutorial threat of this nature is otherwise acceptable, the context—a rapid-fire threat that cut directly against Mr. Norman's stated priority—renders his plea involuntary. *See generally id.* (warning of the "hazard of an impulsive and improvident response"). No Rule 11 colloquy addressed this concern.

The fact that the Magistrate Judge was not made aware of the oral exchange is relevant. Had this—or any—magistrate judge been made aware of a prosecutor's remark of this nature, during a recess after the defendant had expressed reluctance to plead guilty, it is unlikely the plea would have been accepted. At a minimum, a duly informed magistrate judge would have revisited the entire colloquy, with emphasis on the government's threat, and with the purpose of resolving to the court's full satisfaction that the defendant had not had his will violated. That the Magistrate Judge was not so informed here only confirms the conclusion that the plea was not voluntary. And "[a] guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void." *Machibroda v. United States*, 368 U.S. 487, 493 (1962).

Further, because of the timing of the threat, Mr. Norman need not overcome the presumed truthfulness of his own prior statements. In a typical case, he would need to explain his own contradictory testimony: his plea colloquy specifically denies any coercion impacting his decision to plead guilty. Such a statement is presumed true: "[T]he district court is permitted to make a strong presumption of truth regarding statements made by a defendant during a plea colloquy." *United States v. Oliver*, 316 F. App'x 877, 879 (11th Cir. 2008) (citing *United States v. Medlock,* 12 F.3d 185, 187 (11th Cir. 1994)). As a result, in most cases, a defendant

13

"bears a heavy burden to show his statements [under oath] were false." *United States v. Reid*, 256 F. App'x 317, 320 (11th Cir. 2007).

Here, however, Mr. Norman's statements during the plea colloquy do not disprove his allegations. The threats he alleges, and which his attorney confirms, occurred *after* the plea colloquy and after Norman's responses. Those responses cannot be deemed to disprove a *subsequent* threat. And as noted, the Magistrate Judge did not conduct further questioning after the recess: Mr. Norman was not asked after the break if he had been threatened or coerced into pleading guilty *during* the break, when the alleged threats occurred. Mr. Norman, therefore, need not overcome the presumption of verity normally accorded to his sworn testimony. Thus, it is clear that Mr. Norman's plea emerged, at least in part, from a substantial threat that was not addressed in a Rule 11 colloquy. It cannot be said that such a colloquy, though formally correct, confirmed a lack of coercion behind Mr. Norman's plea. To the contrary, given these facts, the court is not satisfied that Mr. Norman's plea was entered knowingly and voluntarily. This finding weighs heavily in favor of allowing Mr. Norman to withdraw his plea.

## C. **Judicial Resources and Government Prejudice**

As to the third and fourth prongs, the Government's arguments are ultimately unpersuasive. Neither the use of judicial resources nor the risk of prejudice against the government counsels against the granting of Mr. Norman's motion.

14

The Government argues that, because of the passage of time, trying the case may prove more difficult. It also argues that, should the guilty plea be withdrawn, judicial resources will likely be spent in bringing Mr. Norman's case to trial. But these arguments, though probably true, are not dispositive.

First, the use of judicial resources on a possible trial, even a delayed trial, is a factor to be considered, but it alone does not outweigh valid reasons for a plea withdrawal. "[T]he cost of trial and the burden of establishing guilt are not alone sufficient to prevent the withdrawal of a guilty plea pursuant to Rule 11(d)(2)(B). To conclude otherwise would reduce the rule to a nullity." *United States v. Miller*, 694 F. Supp. 2d 1259, 1265 (M.D. Ala. 2010) (Thompson, J.). Further, judicial resources may in fact be conserved on net: The withdrawal of the plea may prevent "inevitable collateral proceedings." (Doc. # 624, at 42.) And finally, to the extent that the Government's work will become more difficult—a near-inevitability, given the passage of time—it was warned: Mr. Norman's first letter, at minimum, "put[] the Government on notice that a trial may become necessary" less than 30 days after the initial plea was entered. *United States v. Williams*, No. CR410-257, 2011 WL 2709164, at *4 (S.D. Ga. July 12, 2011) (Moore, J.).

D.  **Timing of Motion to Withdraw**

Finally, in considering the four relevant factors, courts often consider the timing of the defendant's motion, typically in an effort to assess the defendant's

15

motivation and credibility. *See Gonzalez-Mercado*, 808 F.2d at 801 ("The timing of the appellant's motion to withdraw also deserves our consideration."). As the Eleventh Circuit has noted, "[t]he longer the delay between the entry of the plea and the motion to withdraw it, the more substantial the reasons must be as to why the defendant seeks withdrawal." *Buckles*, 843 F.2d at 473.

Here, Mr. Norman's delay was comparatively short. *See, e.g.*, *United States v. Brehm*, 442 F.3d 1291, 1299 (11th Cir. 2006) (describing a defendant who "did not seek to withdraw his plea until April 2005, long after he had pled guilty in July 2004"). Further, Mr. Norman's efforts to withdraw his plea came *before* sentencing. His actions thus do not violate the Eleventh Circuit's warning that "guilty pleas should not be used to test the weight of the potential sentence." *United States v. Rogers*, 848 F.2d 166, 169 (11th Cir. 1988). Mr. Norman did not seek to avoid an imposed sentence, *see id.*, or cause a delay by his own unlawful actions, *see Buckles*, 843 F.2d at 474 (describing a delay caused by a defendant's decision to flee). Mr. Norman's own efforts, including the filing of the instant motion, occurred within a reasonable time period and do not suggest an improper motive; he ought not be punished for the overall delay that occurred after he filed by no fault of his own.[3]

---

[3] The Government has suggested that Mr. Norman only sought to withdraw his plea after a co-defendant was found not guilty in the summer of 2016. But as early as November 2015, Mr. Norman wrote that he sought to take his case to trial, rather than keep his plea: "I really feel I want to take my case to trial . . . ." (Doc. #. 311.) As the Eleventh Circuit recognized, this was Mr. Norman's first motion to withdraw his guilty plea. *See Norman*, 736 F. App'x at 225.

*See generally Brehm*, 442 F.3d at 1298 (noting, on review, that the district court had considered the delay between a plea and the defendant's motion to withdraw); *Rogers*, 848 F.2d at 168 (noting that, in considering the motivations of a defendant, "the timing *of the motion to withdraw* deserves some attention") (emphasis added); *Buckles*, 843 F.2d at 474 ("Buckles' own conduct necessitated expenditure of time and money to effect his recapture and caused a long, inordinate, and inexcusable delay in finalizing this case.").

## IV. CONCLUSION

Having examined the totality of the circumstances, with special attention to the relevant factors, the court concludes that Mr. Norman has offered a "fair and just reason" to withdraw his plea of guilty. Accordingly, it is ORDERED that Mr. Norman's motions to withdraw his plea (Docs. # 311, 394) are GRANTED.

DONE this 5th day of December, 2019.

                                                        /s/ W. Keith Watkins
                                      UNITED STATES DISTRICT JUDGE